RAMON ROSSI LOPEZ (State Bar # 86361)
AMORINA P. LOPEZ (State Bar # 278002)
**LOPEZ MCHUGH LLP**
120 Vantis Drive, Suite 430
Aliso Viejo, CA  92656
Telephone: (949) 737-1501
Facsimile: (949) 737-1504
rlopez@lopezmchugh.com
alopez@lopezmchugh.com

Attorneys for Plaintiff, Adrian Lowe

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIANE LOWE, individually, | Case No. |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | (1) Strict Liability—Manufacturing Defect; |
| C.R. BARD, INC., a New Jersey Corporation, BARD PERIPHERAL VASCULAR, INC., an Arizona corporation, and DOES 1 through 10, | (2) Strict Liability—Failure to Warn; |
| | (3) Negligence—Design, Manufacture, Sale; |
| Defendants. | (4) Negligence—Failure to Recall/Retrofit; |
| | (5) Negligence—Failure to Warn; |
| | (6) Negligence—Misrepresentation; |
| | (7) Breach of Express Warranty; |
| | (8) Breach of Implied Warranty for a Particular Purpose; |
| | (9) Breach of Implied Warranty of Merchantability; |
| | (10) Fraud—Misrepresentation; |
| | (11) Fraud—Concealment; |
| | (12) Violation of California Law Prohibiting Consumer Fraud and Unfair Deceptive Trade Practices |
| | **DEMAND FOR A JURY TRIAL** |

Plaintiff ADRIANE LOEWE hereby sues defendants C.R. BARD, INC.;

BARD PERIPHERAL VASCULAR, INC.; and DOES 1 through 10 (collectively,

the "Defendants") and alleges as follows:

**COMPLAINT FOR DAMAGES**

## **INTRODUCTORY ALLEGATIONS**

1.    Plaintiff Adriane Lowe at all times relevant to this action resided in and continues to reside in Westlake Village, California.  On or about August 5, 2009, she underwent placement of a G2X Filter (referred to as the "Device" or the "G2X Filter") to address her deep vein thrombosis.  The G2X Filter subsequently failed and fractured, embolized and perforated Plaintiff's right ventricle causing life-threatening injuries and damage.  Plaintiff was caused to undergo extensive medical care and treatment, including 2 heart surgeries; the first surgery   was performed on April 13, 2020 and was an emergent median sternotomy performed to repair the right ventricular perforation and the second surgery occurred on July 2, 2020 and was performed to remove the device. Plaintiff has suffered and will continue to suffer significant medical expenses, extreme pain and suffering, loss of enjoyment of life, disability, and other losses.

2.    Defendant C.R. Bard, Inc. ("Bard") is a corporation duly organized and existing under the laws of the state of New Jersey and has its principal place in New Jersey.  Bard at all times relevant to this action, designed, set specifications for, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the G2X Filter System to be implanted in patients throughout the United States, including California.

3.    Defendant Bard Peripheral Vascular, Inc. ("BPV") is a wholly owned subsidiary corporation of defendant Bard, with its principal place of business at 1625 West 3rd Street, Tempe, Arizona.  BPV at all times relevant to this action, designed, set specifications for, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the G2X Filter System to be implanted in patients throughout the United States, including California.

4.    The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sue said

**COMPLAINT FOR DAMAGES**

Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiff as is hereinafter alleged, and that each DOE defendant is liable to Plaintiff for the acts and omissions alleged herein below and the injuries and damages resulting therefrom. Plaintiff seeks leave to amend this Complaint to allege the true names and capacities of said DOE defendants when the same are ascertained.

5. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants and each of the DOE defendants were the agent, servant, employee and/or joint venturer of the other co-defendants and other DOE defendants, and each of them, and at all said times each Defendant and each DOE defendant was acting in the full course, scope, and authority of said agency, service, employment and/or joint venture.

6. Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, Defendants and DOES 1 through 10, and each of them, were also known as, formerly known as, and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding, researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging, and advertising the Device. Defendants and DOES 1 through 10, and each of them, are liable for the acts, omissions and tortious conduct of its successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, parent, subsidiary, affiliate, partner, co-venturer, merged company, alter ego, agent, equitable trustee, fiduciary and/or its alternate entities in that Defendants

and DOES 1 through 10, and each of them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or product line (or a portion thereof), and in that there has been a virtual destruction of Plaintiff's remedy against each such alternate entity, and that each such Defendant has the ability to assume the risk-spreading role of each such alternate entity.

7.    Plaintiff is informed and believes, and thereon alleges that, at all times herein mentioned, Defendants and DOES 1 through 10, and each of them, were and are corporations organized and existing under the laws of the State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in the State of California.

8.    Upon information and belief, at all relevant times, Defendants and DOES 1 through 10, and each of them, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the State of California, either directly or indirectly through third parties or related entities, its products, including the Device.

9.    At all relevant times, Defendants and DOES 1 through 10, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the State of California, which included but was not limited to researching, developing, selling, marketing, and distributing their products including the Device in the State of California.

10.    Upon information and belief, at all relevant times, Defendants and DOES 1 through 10, and each of them, expected or should have expected that their acts would have consequences within the United States including in the State of California, and said Defendants derived and continue to derive substantial revenue therefrom.

**COMPLAINT FOR DAMAGES**

## JURISDICTION AND VENUE

11.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(1) because the Plaintiffs and the Defendants are citizens of different states, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), excluding interest and costs.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since the Plaintiff resided in the Central District of California at the time of implantation of the G2X filter and the resulting injury, and the Defendants regularly conduct business in this District.

## GENERAL FACTUAL ALLEGATIONS

13.    Plaintiffs bring this case due to the serious personal injuries Adriane Lowe suffered as result of a surgically implanted G2X Filter that fractured and failed, then perforated her right ventricle, causing pericardial tamponade within her body and caused serious and ongoing physical, emotional, and economic damages.

14.    The G2X Filter was designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold by Defendants from approximately April 2003 through August 2005 for the prevention of blood clots from travelling from the lower portions of the body to the heart and lungs.

15.    Defendants were negligent in, among other things, the design and post-market surveillance of the device because they were aware that the risks posed by the device exceeded the burden of taking available safety measures that would have reduced the risk of harm. These safety measures include the failure to conduct worst case testing and the failure to incorporate additional safety features. These additional safety features include, *inter alia,* numerous design elements to reduce the risk of fracture and improvements to the anchoring mechanism to prevent tilting, movement and perforation, all of which also increase the risk of fracture. Defendants were also negligent for failing to recall or to stop marketing the device once they realized that the device was not performing as expected and intended, was

significantly more likely to fail and cause injury than other available devices, and its risks exceeded any benefits.

16. Defendants failed to provide adequate warnings of the dangers posed by its product because Bard knew that its G2X filter was substantially more likely to fail and cause injury than other devices, and yet Defendants actively marketed these devices as being safer than or at least as safe as other devices.

17. Defendants also engaged in fraud, deceit and concealment in that Defendants knowingly misrepresented the benefits of the G2X Filter and concealed and downplayed its risks so as to maintain sales and stock prices. First, despite knowing that the G2X Filter was substantially more likely to fracture, migrate, tilt, and cause death than any other filter, Defendants marketed the filter as being safer and more effective than all other filters. Second, Defendants provided mandatory scripts to its sales force, which required them to falsely tell physicians that the G2X Filter was safe because it had the same reported failure rates as all other filters. Third, Defendants' labeling materials also downplayed the risks associated with the G2X filter in that they never reported the G2X Filter may expose patients to higher risks. Further, the misleading labeling suggested that most fractures caused no harm and that failures had only been "reported" to have caused injury versus had been "confirmed" to cause serious injuries and death. Fourth, Defendants also concealed from physicians that, according to their own internal safety procedure, the device was deemed not reasonably safe for human use. Fifth, Defendants sought to assure users of the safety of the G2X Filter by comparing its MAUDE data failure rates, of which Bard knew only 1-10% are reported, to the highest reported failure rate from a study, in which all failures are captured.

18. Defendants also violated the warranty of merchantability because the G2X filter implanted in Ms. Lowe failed to conform to the representations contained in the labeling and marketing materials and was not fit for its intended use.

**COMPLAINT FOR DAMAGES**

19.     Finally, Defendants knew and/or should have known that the G2X Filter contained characteristics and conditions unintended by Defendants that resulted in the device not performing as safely as the ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

## INFERIOR VENA CAVA FILTERS GENERALLY

20.     Inferior vena cava ("IVC") filters first came on to the medical market in the 1960's. Over the years, medical device manufacturers have introduced several different designs of IVC filters.

21.     An IVC filter is a device that is designed to filter or "catch" blood clots that travel from the lower portions of the body to the heart and lungs.  IVC filters are designed to be implanted, either permanently or temporarily, in the inferior vena cava.

22.     The inferior vena cava is a vein that returns blood to the heart from the lower portions of the body.  In certain people, for various reasons, blood clots travel from the vessels in the legs and pelvis, through the vena cava and into the lungs. Oftentimes, these blood clots develop in the deep leg veins, a condition called "deep vein thrombosis" or "DVT."  Once blood clots reach the lungs, they are considered "pulmonary emboli" or "PE."  Pulmonary emboli present risks to human health, although small clots are often absorbed by the lungs, and cause no symptoms or ill effects.

23.     People at risk for DVT/PE can undergo medical treatment to manage the risk.  For example, a doctor may prescribe medications like Heparin, Warfarin, or Lovenox to regulate the clotting factor of the blood.  In some people who are at high risk for DVT/PE, or who cannot manage their conditions with medications, physicians may recommend surgically implanting an IVC filter to prevent thromboembolic events.

24.     In order to increase sales of these devices, Bard sought to expand the market for prophylactic use among nontraditional patient populations that were temporarily at risk of developing blood clots.

25.     Specifically, Bard targeted the bariatric, trauma, orthopedic and cancer patient populations.  Expansion to these new groups would triple sales and the first manufacturer to market would capture market share.

26.     At the same time, Bard was aware that physicians developed interest in filter devices that could be easily removed after the risk of clotting in these new patient populations subsided.  This, too, was an opportunity to gain market share in the lucrative IVC filter market.

27.     Other manufacturers also saw this opportunity, which triggered a race to market a device that provided physicians the option to retrieve the filter after the clot risk subsided.

28.     Bard was the first medical device manufacturer to obtain FDA clearance for marketing a "retrievable" IVC filter (the Bard Recovery filter) in July 2003.

29.     This "clearance" was obtained despite lack of adequate testimony on the safety and efficacy of the new line of devices.

30.     As shown below, Bard's retrievable IVC filters have been plagued with problems – all created by Bard itself – most notably, the absence of any evidence that the products were effective in preventing pulmonary embolism (the very condition the product was indicated to prevent).

31.     Years after the implantation of retrievable filters into the bodies of patients, scientists began to study the effectiveness of the retrievable filters – studies that Bard itself had never done before placing the product on the market.  As recently as October 2015, an expansive article published in the *Annals of Surgery* concerning trauma patients inserted with IVC filters concluded that IVC filters were

not effective in preventing pulmonary emboli, and instead actually caused thrombi to occur.

32.     Comparing the results of over 30,000 trauma patients who had not received IVC filters with those who had received them, the *Annals of Surgery* study published its alarming results:

a.  Almost twice the percentage of patients with IVC filters in the study died compared to those that had not received them.

b.  Over five times the relative number of patients with IVC filters developed DVTs.

c.  Over four times the relative percentage of patients with filters developed thromboemboli.

d.  Over twice the percentage of patients developed a pulmonary embolus – the very condition Bard told the FDA, physicians, and the public that its IVC Filters were designed to prevent.

33.     This *Annals of Surgery* study – and many others referenced by it – now shows without any question that IVC filters are not only utterly ineffective, but that they are themselves a health hazard.

## THE RECOVERY FILTER

**A.     Development and Regulatory Clearance of the Recovery Filter**

34.     Bard has distributed and marketed the Simon Nitinol Filter ("SNF") device since 1992.  The SNF is a permanent filter, but it can be retrieved, percutaneously, after implantation.

35.     The SNF was initially manufactured by a company known as Nitinol Medical Technologies.  In late 1999, Bard worked with Nitinol on the redesign of the SNF to obtain a retrievable indication.

**COMPLAINT FOR DAMAGES**

36.     On October 19, 2001, Bard purchased the rights to manufacture, market and sell this new, redesigned product in development at the time. This product ultimately became the Recovery filter.

37.     Bard's purpose for making a retrievable IVC filter was to increase profits by expanding the overall IVC filter market and, in turn, Bard's percentage share of that market.

38.     Bard engaged in an aggressive marketing campaign for the filter, despite negative clinical data.

39.     On November 27, 2002, Bard bypassed the more onerous Food and Drug Administration's ("FDA's") approval process for new devices and obtained "clearance" under Section 510(k) of the Medical Device Amendments to the Food, Drug and Cosmetic Act to market the Recovery filter as a *permanent* filter by claiming it was substantially similar in respect to safety, efficacy, design and materials as the SNF.

40.     Section 510(k) permits the marketing of medical devices if the device is substantially equivalent to other legally marketed predicate devices without formal review for the safety or efficacy of the said device. The FDA explained the difference between the 510(k) process and the more rigorous "premarket approval" (PMA) process in its amicus brief filed with the Third Circuit in Horn v. Thoratec Corp., which the court quoted from:

> A manufacturer can obtain an FDA finding of 'substantial equivalence' by submitting a premarket notification to the agency in accordance with section 510(k) of the [Food Drug and Cosmetic Act]. 21 U.S.C. § 360(k). A device found to be 'substantially equivalent' to a predicate device is said to be 'cleared' by FDA (as opposed to 'approved' by the agency under a PMA. *A pre-market notification submitted under 510(k) is thus entirely different from a PMA which must include data sufficient to demonstrate that the IVC Filters is safe and effective.*

376 F.3d 163, 167 (3d Cir. 2004) (emphasis in original).

41.     In *Medtronic, Inc. v. Lohr*, the U.S. Supreme Court similarly described the 510(k) process, observing:

> If the FDA concludes on the basis of the [manufacturer's] § 510(k) notification that the device is "substantially equivalent" to a pre-existing device, it can be marketed without further regulatory analysis. . . . The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in average of 20 hours. . . . As one commentator noted: "The attraction of substantial equivalence to manufacturers is clear. Section 510(k) notification requires little information, rarely elicits a negative response from the FDA, and gets processed quickly."

518 U.S. 470, 478-79 (1996) (quoting Adler, The 1976 Medical Device Amendments: A Step in the Right Direction Needs Another Step in the Right Direction, 43 Food Drug Cosm. L.J. 511, 516 (1988)).

42.     Pursuant to *Wyeth v. Levine*, 555 U.S. 555 (2009), once a product is cleared "the manufacturer remains under an obligation to investigate and report any adverse events associated with the drug . . . and must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling . . ."  This obligation extends to post-marketing monitoring of adverse events/complaints.

43.     In July 2003, through this 510(k) process, Bard obtained clearance from the FDA to market the Recovery filter for optional retrieval.

44.     Although Bard began aggressively marketing the Recovery filter in 2003, full market release did not occur until January 2004.

45.     Bard was aware that the Recovery filter was also used extensively off-label, including for purely prophylactic reasons for trauma patients or patients with upcoming surgeries such as bariatric (weight loss) and orthopedic procedures.

**COMPLAINT FOR DAMAGES**

46.    Bard and BPV obtained clearance pursuant to the 510k process to market the Recovery filter on November 27, 2002 as a permanent filter by claiming it was substantially similar in respect to safety, efficacy, design, and materials as the Simon Nitinol filter.

47.    Bard and BPV subsequently obtained clearance to market the Recovery filter for optional retrieval on July 23, 2003.

48.    Bard and BPV began actually marketing the device in April 2003, but did not begin full market release until 2004.  Bard and BPV were aware that the Recovery Filter was also used extensively off-label, including for purely prophylactic reasons for trauma patients or patients with upcoming surgeries such as bariatric procedures.

49.    The Recovery Filter consists of two (2) levels of six (6) radially distributed NITINOL struts that are designed to anchor the filter into the inferior vena cava and to catch any embolizing clots.  There are six short struts, which are commonly referred to as the "arms," and six long struts, which are commonly referred to as the "legs."  Each strut is held together by a single connection to a cap located at the top of the device.  According to the Patent filed for this device, the short struts are primarily for "centering" or "positioning" with the vena cava, and the long struts with attached hooks are designed primarily to prevent the device from migrating in response to "normal respiratory movement" or "pulmonary embolism."

50.    As noted above, the Recovery Filter is constructed with NITINOL, which is an acronym that stands for Nickel Titanium Naval Ordnance Laboratory.  NITINOL possesses "shape memory," meaning NITINOL will change shape according to changes in temperature, then retake its prior shape after returning to its initial temperature.  When placed in saline, the NITINOL struts become soft and can be straightened to allow delivery through a small diameter catheter.  The metal struts

then resume their original shape when warmed to body temperature in the vena cava.

51.    The Recovery Filter is inserted by a catheter that is guided by a physician (normally an interventional radiologist) through a blood vessel into the inferior vena cava.  The Recovery Filter is designed to be retrieved in a similar fashion.

52.    According to the Instructions for Use of this medical device, only the Recovery Cone System could be used to retrieve the Recovery filter (as well as subsequent generations of Bard's IVC filters).

53.    The Recovery Cone System is an independent medical device requiring approval by the FDA under the pre-market approval process or, if a substantially equivalent medical device was already on the market, clearance by the FDA pursuant to the 510(k) application process.

54.    Although Bard marketed and sold the Recovery Cone System separately, it never sought or obtained approval or clearance from the FDA for this device.

55.    Bard's sale of the Recovery Cone System was, therefore, illegal.

56.    Bard illegally sold the Recovery Cone System in order to promote the Recovery filter as having a retrieval option.

**B.    Post-Market Performance Revealed The Device Failed to Perform as Expected**

57.    Once placed on the market, Bard immediately became aware of numerous confirmed events where the Recovery fractured, migrated, or perforated the vena cava and caused serious injury, including death from *in vivo* forces.

58.    Premarket and post-market clinical trials revealed that the Recovery failed and caused serious risk of harm.  In addition, peer-reviewed literature reflected that such filters actually increased the risk of patients developing thromboembolic events.

59.     Even at launch, Bard predicted that the Recovery Filter would tilt and perforate more than the predicate device, to which Bard represented to the FDA it was substantially equivalent.

60.     Approximately a month after the full-scale launch of the Recovery filter, on February 9, 2004, Bard received notice of the first death associated with this filter.  The next day, a MAUDE analysis was performed which revealed that there had been at least two other migration-related adverse events reported to Bard in 2003.

61.     MAUDE is a database maintained by the FDA to house medical device reports submitted by mandatory reporters (such as manufacturers and device user facilities) and voluntary reporters (such as health care providers and patients).

62.     Instead of pulling the Recovery filter off the market, Bard focused on public relations and protecting its brand and image.  By February 12, 2004, Bard had formed a crisis communication team and drafted at least four communiques to pass onto its sales force containing false information designed to be relayed to concerned doctors.

63.     By April of 2004, at least three deaths had been reported to Bard.  Yet again, instead of recalling its deadly device, Bard concealed this information from doctors and patients and hired the public relations firm Hill & Knowlton to address anticipated publicity that could affect stock prices and sales.

64.     Bard made the decision to continue to market and sell the Recovery filter until its next generation product, the G2 IVC filter, was cleared by the FDA.

65.     The G2 filter, however, was not cleared for market until August 29, 2005.

66.     Meanwhile, the death count escalated.

67.     On July 12, 2004, C.R. Bard CEO Timothy Ring received an executive summary reporting that there were at least 12 filter migrations resulting in four

deaths and at least 17 reports of filter fracture, six cases of which involved strut embolization to the heart.

68. This same report advised that fracture rates for the Recovery filter exceed reported rates of other filters.

69. These events revealed, or should have revealed, to Bard that the Recovery filter is prone to an unreasonably high risk of failure and patient injury following placement in the human body.

70. Bard also learned that the Recovery filter failed to meet migration resistance testing specifications.

71. Bard also manipulated migration resistance testing to increase the temperature above normal body temperature because this artificially improved the migration resistance results.

72. In addition, multiple early studies reported that the Recovery Filter has a fracture and migration rate ranging from 21% to 50%, rates that are substantially higher compared to other IVC filters. More recently, fractures were reported to be as high as 40% after five and a half years from the date of implant.

73. Bard had clear evidence that the Recovery filter was not substantially equivalent to the predecessor SNF, making the Recovery filter adulterated and misbranded, requiring its immediate withdrawal from the market.

74. At least one Bard executive concluded the Recovery filter posed an unreasonable risk of harm and required corrective action, including a recall.

75. Likewise, the G2 filter was predicted to have higher fracture rates as high as 37.5% after five years from the date of implant.

76. Subsequent Bard filter models, including the electropolished version of the G2 filter known as the Eclipse only marginally increased fracture resistance.

77. When IVC filter fractures occur, shards of the filter or even the entire filter can travel to the heart, where they can cause cardiac tamponade, perforation of the atrial wall, myocardial infarction and/or death.

78.     Bard IVC filters similarly pose a high risk of tilting and perforating the vena cava walls.

79.     The Recovery Filter similarly poses a high risk of tilting and perforating the vena cava walls.  When such failures occur, the device can perforate the adjacent aorta, duodenum, small bowel, spine or ureter, kidney, or other organs which may lead to  and, upon information and belief, already have led to retroperitoneal hematomas, small-bowel obstructions, extended periods of severe pain, and/or death.

80.     The Adverse Event Reports (AERs) associated with IVC filter devices demonstrate that Bard's IVC Filters are far more prone to device failure then are other similar devices.  A review of the FDA MAUDE database from the years 2004 through 2008 shows that Bard's IVC filters are responsible for the following percentages of all AERs:

  a.     50% of all adverse events;

  b.     64% of all occurrences of migration of the device;

  c.     69% of all occurrences of vena cava wall perforation; and

  d.     70% of all occurrences of filter fracture.

81.     These failures were often associated with reports of severe patient injuries such as:

  a.     Death;

  b.     Hemorrhage;

  c.     Cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

  d.     Cardiac arrhythmia and other symptoms similar to myocardial infarction;

  e.     Severe and persistent pain; and

  f.     Perforations of tissue, vessels and organs.

**COMPLAINT FOR DAMAGES**

82.     These failures and resulting injuries are attributable, in part, to the fact that the Recovery Filter was designed so as to be unable to withstand the normal anatomical and physiological loading cycles exerted *in vivo*.

83.     In addition to design defects, the Recovery Filter suffers from manufacturing defects.  These manufacturing defects include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the filters.

84.     The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the Bard IVC filters while in the body.  In particular, the Recovery Filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the filter. These exterior manufacturing defects render Bard IVC filters too weak to withstand normal placement within the human body.

85.     Bard was aware that its IVC filters had substantially higher reported failure rates than all other devices for fracture, perforation, migration and death.  For example:

    a.     On April 23, 2004, Bard's Corporate VP of Quality Assurance sent an email noting that the Recovery Filter's reported failure rates "did not look good compared to permanent filters" and promised to remove the filter from the market if its reported death rate became "significantly greater than the rest of the pack."

    b.     On July 9, 2004, a BPV safety analysis of reported failure rates determined that the Recovery Filter had a reported failure rate that was 28 times higher than all other IVC filters.

    c.     On December 17, 2004, analysis determined that the "[r]eports of death, filter migration (movement), IVC perforation, and filter fracture associated with the Recovery Filter were seen in the

MAUDE database at reporting rates that were 4.6, 4.4, 4.1, and 5.3 times higher, respectively, than reporting rates for all other filters." "These deficiencies were all statistically significant…" and were "significantly higher than those for other removable filters."

d.    By December 2004, according to BPV's own safety procedure, the Recovery Filter had so many reported failures that it was deemed not reasonably safe for human use and required "correction."

e.    A BPV safety analysis from June 28, 2011, reveals that the Recovery Filter had a reported fracture rate 55 times higher than the Simon Nitinol filter.

f.    Whereas the Recovery Filter was reported to have caused over a dozen deaths by early 2005, the Simon Nitinol Filter has never been reported to be associated with a patient death.

## C.    Defendants Knew Why the Recovery Filter Was Failing and Were Aware of Available Design Changes that Could Substantially Reduce Said Failures

86.    Bard knew why the design changes made to the Recovery Filter were causing failures.

87.    Bard was aware that the diameter of the leg hooks is a substantial factor in a filter's ability resist migration and fatigue resistance and fatigue.

88.    By reducing the diameter of the hooks on the Recovery filter, Bard had reduced its ability to remain stable and not fracture.

89.    Bard also reduced the leg span of the Recovery Filter from that of the Simon Nitinol filter by 25%, and as a result Bard knew the its retrievable IVC filters

lacked a sufficient margin of safety to accommodate expansion of the vena cava (distension) after placement.

90.    Bard was also aware that its failure to electropolish the wire material prior to distribution meant that the Device had surface damage that reduced its fatigue resistance.

91.    Bard was also aware that the Recovery Filter had a high propensity to tilt and perforate the vena cava, which substantially increased the risk of fracture.

92.    Bard was also aware that fatigue resistance could be increased by decreasing he sharpness of the angle of the wire struts where they exited the cap at the top of the Device, and by chamfering (rounding or reducing the sharpness) of the cap edge against which the struts rubbed.

93.    A few examples of Bard's awareness of the unreasonably dangerous problems with Bard IVC filters include:

a.    On June 18, 2003, BPV engineer, Robert Carr, sent an email noting that chamfering the edge of cap would reduce the likelihood of fracture;

b.    On March 16, 2004, a BPV engineer sent an email admitting that the surface damage, as seen on the Recovery Filter from the manufacturing process, decreases fatigue resistance and that electropolishing increases fatigue resistance;

c.    In a meeting from April 2004, BPV was warned by its physician consultants, Drs. Venbrux and Kaufman, that the migration resistance of the Recovery Filter needed to be raised from 50 mmHg to 140 mmHg. They further warned BPV that the device was a "wimpy" filter and its radial force was inadequate to assure stability.

d.    On May 5, 2004, a BPV engineer sent an email stating that adding a "chamfer" to filter will "address the arm fracture issue."

e.      On May 26, 2004, a BPV engineer sent an email stating that a proposed modified Recovery Filter design with a large chamfer lasted 50 bending cycles before breaking, whereas another proposed modified Recovery Filter with a small chamfer broke after 10 bending cycles.

f.      Bard's bench testing (particularly as to fracture and migration) showed that the Recovery Filter was unable to withstand forces anticipated in the human body, and that it was substantially likely to tilt, perforate, migrate and fracture in patients.

94.     Prior to Plaintiff being implanted with the Bard IVC filter, Bard was also aware of other design changes that could make the Recovery Filter substantially safer.  In a report dated February 16, 2005, BPV describes the design changes to the Recovery Filter, which became known as the G2 Filter.  The report states that the Recovery Filter has been modified to "to increase migration and fracture resistance, and to minimize the likelihood of leg twisting, appendage snagging, filter tilting, and caval perforation."  The document goes on to describe the design modifications, which include:

a.      Increased ground wire diameter of the hook from .0085" to .0105" in order to improve the fracture resistance of the hook and to improve the migration resistance of the filter.

b.      The leg span has been increased from 32mm to 40mm in order to improve ability of the filter to expand with a distending vena cava.

c.      The total filter arm length has increased from 20mm to 25mm, enlarging the Device arm span from 30mm to 33mm to aid in filter centering.

20
**COMPLAINT FOR DAMAGES**

d.    An additional inward bend has been applied to the end of the filter arm in order to improve arm interaction with the vessel wall, to address caval perforations and appendage snagging.

e.    The arc of filter arm, as it attaches to the sleeve, has been modified to have a smooth radial transition instead of sharp angle. This change was made in order to reduce the stress concentration generated by the sharp angle and thus improve fracture resistance in the area of the filter.

f.    The report concludes that the design modifications have substantially reduced the risk of fracture.

95.    Subsequent design changes only marginally improved product safety but did not fully or adequately address the Bard's IVC filters' deadly defects.

96.    Electropolishing was subsequently added to the filter in 2008 to reduce the risk of fracture.  Electropolishing implanted Nitinol medical devices was the industry standard, and increased fatigue resistance by at least 25% according to Bard's internal testing.

97.    Additional anchors were added to the anchoring system on the filter in 2011, in what became known as the Meridian filter.  The purpose of this improvement was to decrease the risk of tilting, which increases the risk of fracture and perforation, and reduce caudal migration.

98.    Bard added penetration limiters with the introduction of Denali Filter in May 2013.

99.    Penetration limiters are designed to reduce perforation and penetration of the vena cava.

**D.    Bard Misrepresented and Concealed the IVC Filters' Risks and Benefits**

100.    Despite knowing that the Recovery Filter was substantially more likely to fracture, migrate, tilt, and cause death than any other filter, Bard marketed its IVC

filters as being safer and more effective than all other filters throughout the lifecycle of the product.

101.   Bard further provided mandatory scripts to the sales force, which required the sales force to falsely tell physicians that the Recovery Filter was safe because it had the same reported failure rates as all other filters.

102.   Even Bard's updated labeling in December 2004 downplayed and concealed the Recovery filter's dangerous effects because it suggested fractures almost always cause no harm and that all filters had the same risk of failure.

103.   Bard's updated labeling also downplayed the risk by stating that serious injuries had only been "reported" when they knew such injuries had been in fact confirmed to have occurred.

**E.    Bard Chose to Keep Selling its Unsafe IVC Filter and Lied to Its Own Sales Force to Ensure Market Share and Stock Prices**

104.   Instead of warning the public or withdrawing the IVC filters from the market to fix these problems, Bard retained a publicity firm, opened a task force to prevent information from getting out to the public, an devised a plan to address the public if it did.

105.   In 2004, Defendants created a Crisis Communication Team that included members of Bard's upper level management, Bard's legal department and independent consultants.

106.   The Crisis Communication Team created a Crisis Communication Plan, which summarized Defendants' motivation for withholding risk information from the public as follows:

> The proliferation of unfavorable press in top-tier media outlets can cause an onslaught of negative activity: a company's employee morale may suffer, stock prices may plummet, analysts may downgrade the affected company's rating, reputations may be ruined temporarily or event permanently.  Extensive preparation is critical to help prevent the spread of damaging coverage.

107.   In an April 2004 email, BPV consultant Dr. John Lehman, a member of the Crisis Communication Team, advised Bard to conceal material risk information

from the public. Bard adopted his advice.  The email states, among other things, the following:

> Comparison with other filters is problematic in many ways, and we should avoid/downplay this as much as possible.  When pressed, we simply paraphrase what was said in the Health Hazard.  That "Estimates based on available data suggest that there is no significant difference in the rates of these complications between any of the devices currently marketed in the U.S., including the Recovery device."
>
> ***
>
> I wouldn't raise this subject if at possible. It would be a most unusual reporter that will get this far.  The testing data I saw in Arizona showed that although RF was certainly within the boundaries of devices tested, in larger veins it was near the bottom.  I would avoid as much as possible getting into this subject, because I'm not sure others would agree with the conclusion that "Recovery Vena Cava Filter was Just as or more resistant to migration than all retrievable and non-retrievable competitors."

108.   Bard also made false representations and omissions to the BPV sales force to keep them selling the IVC filters. Bard continually reassured the sales force that despite the failures with the Recovery Filter, the Device was safe because it had the same failure rates as all other devices.

109.   By December 2004, BPV's own safety procedure deemed the Recovery Filter not reasonably safe for human use.  Yet, Bard continued to market and sell the Recovery filter into September 2005 and continued to allow its defective product to sit on shelves available to be implanted for an unknown period of time after September 2005.

110.   Even after the G2 was launched in September 2005, which Bard alleges to have corrected these problems, Bard still failed to warn consumers of the increased risk posed by the Recovery Filter.  Indeed, in 2006 as reported fracture and associated injury rates were climbing, Bard considered a recall and/or a warning letter that would provide reported failure rates.  The stated benefit of this action was the avoidance of ongoing fractures and related injuries.  However, Bard again chose to conceal this information.

### F.    The G2, Recovery G2 and G2 Express Filters

111.    On or about March 2, 2005, Bard submitted a Section 510(k) premarket notification of intent to market the G2 filter for the prevention of recurrent pulmonary embolism via placement in the inferior vena cava.  In doing so, Bard cited the Recovery filter as the substantially equivalent predicate IVC filter, which was an inappropriate and illegal predicate device since it was being marketed while adulterated and misbranded for failing, among other things, to be as safe and effective as its predicate device, SNF.  Bard stated stated that the only differences between the Recovery filter and the G2 filter were primarily dimensional, and no material changes or additional components were added. It was considered by Bard the next generation of the Recovery filter.

112.    On March 30, 2005, however, the FDA rejected this application unless Bard and BPV included "black box" warnings that read:

Warning: The safety and effectiveness of the Recovery Filter System in morbidly obese patients has not been established. There have been fatal device-related adverse events reported in this population.

[and]

[C]entral venous lines may cause the filters to move or fracture.

113.    On April 19, 2005, prior to formally responding to the FDA's request to add a black box warning, BPV CEO Timothy Ring and C.R. Bard CEO John Weiland received an executive summary reporting that there were at least 34 migrations and 51 fractures associated with Bard IVC filters.

114.    This same report advised Bard executives that there were then nine deaths, six of which related to morbidly obese patients. Further, 18 of the 51 fractures resulted in fragments migrating to the heart.

115.    On April 20, 2005, without alerting the FDA to the alarming information Bard executives had the day before, Bard submitted a letter in response

to the FDA's request to add this black box warning stating that, "There is currently a statement in the IFU linking all of our complications to death."

116.    On August 29, 2005, the FDA cleared the G2 filter for the same intended uses as the Recovery filter, except that it was not cleared for retrievable use.[1] Contrary to the FDA's suggestion, no black box warning was added to warn the bariatric patient population of fatalities associated with the use of the filter.[2]

117.    In September of 2005, Bard quietly and belatedly replaced the Recovery filter on hospital shelves with the G2 filter. Bard either told doctors or led them to believe that the G2 was a new and improved version of the Recovery filter with the same option to retrieve the filter after implant.

118.    At the same time Bard was selling the G2 (then a permanent use filter without any retrievability option), Bard was also selling the SNF, which had the same indication for use with nearly zero adverse events.

119.    Bard marketed the G2 filter as having "enhanced fracture resistance," "improved centering," and "increased migration resistance" without any data to back up these representations. Even if such data existed, Bard witnesses have testified that Bard would not share any such information with doctors if requested.

120.    Moreover, as with its predecessor Recovery filter, Bard failed to conduct adequate clinical and bench testing to ensure that the G2 filter would perform safely and effectively once implanted in the human body.

121.    The G2 filter's design causes it to be of insufficient integrity and strength to withstand normal stresses within the human body so as to resist fracturing, migrating, and/or tilting, and/or perforating the inferior vena cava.

122.    In addition, to the same design defects as its predecessor device, the G2 filter suffers from the same manufacturing defects. These manufacturing defects

---

[1] The FDA did not clear the G2 filter to be used as a retrievable filter until January 15, 2008.

[2] A warning was eventually added to the IFU in October of 2009.

**COMPLAINT FOR DAMAGES**

include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of Bard IVC Filters. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the G2 filter while *in vivo*.

123.    In particular, the G2 filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the IVC Filters.

124.    Put simply, the G2 filter is not of sufficient strength to withstand normal placement within the human body.  The presence of the aforementioned exterior manufacturing defects makes Bard IVC Filters more susceptible to fatigue, failure, and migration.

125.    Similarly, although Bard rounded the chamfer at te edge of the cap of the G2 filter, it continued to fracture at that same location.

126.    Thus, the G2 filter shares similar defects and health risks as the Recovery filter.

127.    Almost immediately upon the release of the G2 filter, Bard received notice of the same series of adverse events of migration, fracture, tilt, and perforation causing the same type of harm as the Recovery filter. This time, however, a new and different adverse event emerged: the G2 filter would caudally (moving against blood flow) migrate in the direction toward the groin.

128.    The G2 filter fractures were again associated with reports of severe patient injuries such as :

a.  Death;

b.  Hemorrhage;

c.  Cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

d.  Cardiac arrhythmia and other symptoms similar to myocardial infarction;

**COMPLAINT FOR DAMAGES**

e.  Severe and persistent pain; and

f.  Perforations of tissue, vessels and organs.

129.   Bard represents the fracture rate of the G2 filter to be 1.2%. Based upon a review of the data available in the public domain (including the FDA MAUDE database statistics and the published medical literature), this representation does not accurately reflect the true frequency of fractures for the G2 filter.

130.   As with the Recovery filter, Bard was aware of clinical data showing that the G2 filter was not the substantial equivalent of its predecessor SNF device, requiring immediate recall of the adulterated and misbranded product.

131.   A review of the MAUDE database from the years 2004 through 2008 demonstrates that the Bard IVC Filters (including the G2 Filter) are responsible for the majority of all reported adverse events related to IVC filters.

132.   On December 27, 2005, Bard's Medical Affairs Director sent an e-mail questioning why Bard was even selling the modified version of the Recovery filter, when Bard's SNF had virtually no complaints associated with it.

133.   This further confirms the misbranded and adulterated nature of the device, requiring corrective action, including recall.

134.   On January 15, 2008, the FDA allowed a retrievable option for the G2 filter, the G2 Express filter. The G2 Express filter (also known as the "G2X") is identical in design to the G2 filter except that it has a hook at the top of the filters that allows it to be retrieved by snares, as well as Bard's Recovery Cone.

135.   The G2X filter contained no design modifications or improvements to alleviate the instability, structural integrity, and perforation problems that Bard knew to exist with the G2X Filter via the 510(k) process.

**G.    The Eclipse Filter**

136.   In a failed effort to resolve the complications associated with its previous filters, Bard designed the Eclipse Vena Cava Filter as the next generation in its retrievable IVC filter family.

137.    The Eclipse filter was cleared by the FDA on January 14, 2010. The only design changes from the G2 family of filters to the Eclipse filter was that the Eclipse filter was electropolished.

138.    According to Bard's internal testing, electropolishing supposedly increased fracture resistance by 25%. However, longitudinal studies published in peer-reviewed medical literature found that among 363 patients implanted with the Recovery filter and 658 patients implanted with the G2 filter, the devices experienced fracture rates of 40% and 37.5%, respectively, after five and a half years. Thus, approximately 28.125% to 30% of Eclipse filters would still be projected to fracture within five and a half years.

139.    Without meaningful design changes, the Eclipse filter continued to share several of the same design defects and complications associated with the Recovery filter and G2 family of filters.

140.    Soon after Bard launched the Eclipse filter, it began receiving complaints and reports of injuries associated with the Eclipse filter similar to those received with its predecessor filters.

141.    Bard, however, knew and/or soon learned that the Eclipse filter was not the substantial equivalent of the SNF, making this device also misbranded and adulterated, and subject to recall.

**H. The Meridian Filter**

142.    The Meridian filter was cleared by the FDA in August of 2011.

143.    Bard represented to the FDA that the Meridian was substantially similar to the Eclipse filter and could therefore be cleared via the less onerous 510(k) process.

144.    Bard, however, knew and/or soon learned that the Meridian filter was not the substantial equivalent of the SNF, making this device also misbranded and adulterated, and subject to recall.

**COMPLAINT FOR DAMAGES**

145.   The Meridian filter system was the next generation of Bard's retrievable or optional filters. The Meridian filter is made of the same nickel-titanium alloy, NITINOL, as the Bard Recovery, G2, and Eclipse filters.

146.   The design of the Meridian is based on the Eclipse filter, which, in turn, is based entirely on the G2 filter, which, in turn is based on the Recovery Filter. Like the Eclipse, the wires used in the Meridian filter are electropolished prior to the forming of the filter. The only added feature to the Meridian filter was a caudal anchoring system added in an attempt to reduce the prevalence of the filter caudal migrating toward the groin.

147.   However, as seen with the Recovery, G2, and Eclipse filters, soon after its introduction to the market reports surfaced that the Meridian filters were fracturing, perforating, migrating, and/or tilting in the patients in which they were implanted.

148.   The Meridian filter was also plagued with the same manufacturing and design defects that were causing damage to the general public as Bard's predecessor retrievable filters.

**I.  The Denali Filter.**

149.   The Denali filter was cleared by the FDA on May 15, 2013. It is Bard's latest generation device in the IVC filter product line.

150.   Bard represented to the FDA that the Denali was substantially similar to the Eclipse filter, again bypassing formal pre-market FDA approval and instead utilizing the 510(k) process.

151.   The Denali Filter is also made of NITINOL. Its design is based on the Eclipse filter, which in turn, was based on Bard's predecessor filter line. Like the Eclipse, the NITINOL wires used in the Denali filter are electropolished prior to the forming of the filter. The added features to the Denali Filter were cranial and caudal anchoring systems (to reduce the prevalence of the filter migration) and penetration limiters.

**COMPLAINT FOR DAMAGES**

152.    However, as seen with the Recovery, G2, G2X (G2 Express), and Eclipse Filters, soon after its introduction to the market, reports were made that the Denali filters were fracturing, perforating, migrating, and/or tilting in the patients in which they were implanted.

153.    The Denali filter was likewise plagued with the same manufacturing and design defects that were causing damage to the general public in Bard's predecessor retrievable filter family.

154.    At all times material hereto from the design phase, testing, and manufacture of the Recovery filter through the Denali filter, Bard lacked a thorough understanding dynamics of caval anatomy that impacted testing methods.

155.    At this time, Bard IVC filters contain the same or substantially similar defects resulting in the same or substantially similar mechanism of injury to Plaintiff.

156.    At this time, all Bard IVC Filters are misbranded and adulterated by virtue of them failing to be the substantial equivalent of their predecessor devices, all of which were required to be as safe and effective as the original predicate device, the Simon Nitinol Filter, and none were/are, making them subject to corrective action, including recall, in the interest of patient safety. The use of each of these subject devices was inappropriate and illegal since each was being marketed while adulterated and misbranded for failing, among other things, to be as safe and effective as the originating predicate device, SNF.

157.    At all relevant times, safer and more efficacious designs existed for these products, as well as reasonable treatment alternatives.

**J.    Estoppel from Pleading Statutes of Limitations or Repose**

158.    Plaintiff incorporates by reference all prior allegations.

159.    Plaintiff is within the applicable statute of limitations for Plaintiff's claims because Plaintiff (and Plaintiff's healthcare professionals) did not discover,

and could not reasonably discover, the defects and unreasonably dangerous condition of their Bard IVC Filters.

160.   Plaintiff's ignorance of the defective and unreasonably dangerous nature of the Bard IVC Filters, and the causal connection between these defects and Plaintiff's injuries and damages, is due in large part to Bard's acts and omissions in fraudulently concealing information from the public and misrepresenting and/or downplaying the serious threat to public safety its products present.

161.   In addition, Bard is estopped from relying on any statutes of limitation or repose by virtue of its unclean hands, acts of fraudulent concealment, affirmative misrepresentations and omissions, and failing to timely disclose the unreasonably dangerous and defective nature of Bard's IVC filter product and facts that would have alerted Plaintiff that of an injury and that the injury was attributable to the Filter and the fault of another.

162.   Such conduct includes intentional concealment from Plaintiff, Plaintiff's health care professionals, and the general consuming public of material information that Bard IVC Filters had not been demonstrated to be safe or effective, and carried with them the risks and dangerous defects described above.

163.   Plaintiff reasonably relied on Defendants' representations and misrepresentations, which caused delay in learning the true facts related to this case, and therefore a reasonable delay in filing this action.

164.   Bard had a duty to disclose the fact that Bard IVC Filters are not safe or effective, not as safe as other filters on the market, defective, and unreasonably dangerous, and that their implantation and use carried with it the serious risk of developing perforation, migration, tilting, and/or fracture.

## SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF

165.   On or about August 5, 2009, at Los Robles Hospital, located in the County of Los Angeles, State of California, Plaintiff Adriane Loew underwent surgical placement of a G2X Filter to prevent pulmonary embolism.  The G2X Filter

subsequently failed and migrated, perforating Plaintiff's right ventricle and fracturing.

166.    This G2X Filter device was designed, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold by Defendants.

167.    Due to fracture, perforation and failure of the Device, on April 13, 2020, doctors performed an emergency median sternotomy for repair of Plaintiff's right ventricular perforation, drainage of pericardial blood and hematoma.  Included in the operative findings for this first procedure were Plaintiff's pericardium was tense with blood and clots causing cardiogenic shock from pericardial tamponade.

168.    Due to fracture, perforation and failure of the Device, on  July 2, 2020, doctors surgically removed the Device from Plaintiff.

169.    Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, loss of enjoyment of life, disability, and other losses. Plaintiff will require ongoing medical care to monitor the damage she suffered from the failed and defective device.

### FIRST CAUSE OF ACTION
### [Strict Liability—Manufacturing Defect]

For a First Cause of Action, Plaintiff complains of Defendants and alleges as follows:

170.    Plaintiff hereby incorporates by reference paragraphs 1 through 170 herein, as though alleged fully in this Cause of Action.

171.    Prior to, on, and after the date the Device was implanted in Plaintiff, and at all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the Device for use in the United States.

172.    At all times herein mentioned, Defendants designed, distributed, manufactured, marketed, and sold the Device such that it was dangerous, unsafe, and defective in manufacture, and contained a manufacturing defect when it left Defendants' possession.

**COMPLAINT FOR DAMAGES**

173.   Plaintiff is informed and believes, and on that basis alleges, that the Device contained a manufacturing defect, in that it differed from the manufacturer's design or specifications, or from other typical units of the same product line.

174.   As a direct and legal result of Defendants' design, manufacture, marketing, and sale of the Device prior to, on, and after the date Plaintiff used the Device, Plaintiff suffered the injuries and damages herein described.

WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

## SECOND CAUSE OF ACTION
### [Strict Liability—Failure to Warn]

For a Second Cause of Action, Plaintiff complains of Defendants and alleges as follows:

175.   Plaintiff hereby incorporates by reference paragraphs 1 through 174 herein, as though alleged fully in this Cause of Action.

176.   Prior to, on, and after the dates during which the Device was implanted in Plaintiff, and at all relevant times, Bard engaged in the business of testing, developing, designing, manufacturing, packaging, labeling, marketing and/or promoting, selling and/or distributing Bard IVC Filters and through that conduct has knowingly and intentionally placed Bard IVC Filters into the stream of commerce with full knowledge that they reach consumers such as Plaintiff who would become implanted with them.

177.   Bard did, in fact, test, develop, design, manufacture, package, label, market and/or promote, sell and/or distribute Bard IVC Filters to Plaintiff, Plaintiff's prescribing health care professionals, and the consuming public. Additionally, Bard expected that the Bard IVC Filters they were selling, distributing, supplying, manufacturing, and/or promoting to reach, and did, in fact, reach, prescribing health care professionals and consumers, including Plaintiff and Plaintiff's prescribing

health care professionals, without any substantial change in the condition of the product from when it was initially distributed by Bard.

178.    The Bard IVC filters had potential risks and side effects that were known or knowable to Defendants by the use of scientific knowledge available before, at, and after the manufacture, distribution, and sale of the IVC filters.  Bard knew or should have known of the defective condition, characteristics, and risks associated with its IVC filters, as previously set forth herein.  Said defective conditions included, but were not limited to, the following: (1) that the Bard IVC filters posed a significant and higher risk than other similar devices of device failure (fracture, migration, tilting, and perforation of the vena cava wall); (2) Bard IVC Filter failures result in serious injuries and death; and (3) certain conditions or post-implant procedures, such as morbid obesity or open abdominal procedures, could affect the safety and integrity of Bard IVC Filters.

179.    Bard IVC filters were in a defective and unsafe condition that was unreasonably and substantially dangerous to any user or consumer implanted with Bard IVC Filters, such as Plaintiff, when used in an intended or reasonably foreseeable way.

180.    The warnings and directions Bard provided with Bard IVC Filters failed to adequately warn of the potential risks and side effects of Bard IVC Filters.

181.    These risks were known or were reasonably scientifically knowable to Bard, but not known or recognizable to ordinary consumers, such as Plaintiff, or Plaintiff's treating doctors.

182.    Bard IVC filters were expected to and did reach Plaintiff without substantial change in its condition, labeling, or warnings as manufactured, distributed, and sold by Bard. Additionally, Plaintiff and Plaintiff's physicians used the Bard IVC filter in the manner in which it was intended to be used, making such use reasonably foreseeable to Bard.

**COMPLAINT FOR DAMAGES**

183.   Defendants' lack of sufficient instructions or warnings prior to, on, and after the date Plaintiff used the Device was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

### THIRD CAUSE OF ACTION
### [Negligence—Design, Manufacture, Sale]

For a Third Cause of Action, Plaintiff complains of Defendants and alleges as follows:

184.   Plaintiff hereby incorporates by reference paragraphs 1 through 183 herein, as though alleged fully in this Cause of Action.

185.   Prior to, on, and after the date the Device was implanted in Plaintiff, and at all relevant times, Defendants designed, tested, distributed, manufactured, advertised, sold, and marketed the Device for use by consumers, such as Plaintiff, in the United States.

186.   Prior to, on, and after the date the Device was implanted in Plaintiff, Defendants were negligent and careless in and about their design, testing, distribution, manufacture, advertising, sale, and marketing of the Device.

187.   At the time of design, distribution, manufacture, advertising, sale, marketing of the Device, and implantation in Plaintiff, Bard was aware that Bard IVC Filters were designed and manufactured in a manner presenting:

a.   An unreasonable risk of fracture of portions of the filters;

b.   An unreasonable risk of migration of the device and/or portions of the filters;

c.   An unreasonable risk of the filters tilting and/or perforating the vena cava wall; and

d.   Insufficient strength or structural integrity to withstand normal placement within the human body.

188.   At the time of the design, distribution, manufacture, advertising, sale, and marketing of Bard IVC Filters, and their implantation in Plaintiff, Bard also was aware that Bard IVC Filters:

    a.   Would be used without inspection for defects;

    b.   Would be used by patients with special medical conditions such as Plaintiff;

    c.   Had previously caused serious bodily injury to its users with special medical conditions such as Plaintiff;

    d.   Had no established efficacy;

    e.   Were less efficient than the predicate SNF;

    f.   Would be implanted in patients where the risk outweighed any benefit or utility of the filters;

    g.   Contained instructions for use and warnings that were inadequate; and

    h.   Required retrieval (as to the Recovery and G2 filters) by a device that was not approved or cleared by the FDA for retrieval.

189.   Bard had a duty to exercise due care and avoid unreasonable risk of harm to others in the design of Bard IVC filters.

190.   Bard breached these duties by, among other things:

    a.   Designing and distributing a product in which it knew or should have known that the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

    b.   Designing and distributing a product which it knew or should have known that the likelihood and severity of potential harm from the

product exceeded the likelihood of potential harm from other IVC filters available for the same purpose;

c.  Failing to perform reasonable pre- and post-market testing of Bard IVC Filters to determine whether or not the products were safe for their intended use;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Bard IVC Filters so as to avoid the risk of serious harm associated with the use of Bard IVC Filters;

e.  Advertising, marketing, promoting, and selling Bard IVC Filters for uses other than as approved and indicated in the products' labels;

f.  Failing to establish an adequate quality assurance program used in the manufacturing of Bard IVC Filters; and

g.  Failing to perform adequate evaluation and testing of Bard IVC Filters when such evaluation and testing would have revealed the propensity of Bard IVC Filters to cause injuries similar to those that Plaintiff suffered.

191.  As a direct and legal result of the above-described negligence in design, testing, distribution, manufacture, advertising, sales, and marketing, Plaintiff suffered the injuries herein described.

192.  Defendants' negligence in design, testing, distribution, manufacture, advertising, sales, and marketing prior to, on, and after the date of implantation of the Device in Plaintiff was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

///

**COMPLAINT FOR DAMAGES**

## FOURTH CAUSE OF ACTION
### [Negligence—Failure to Recall/Retrofit]

For a Fourth Cause of Action, Plaintiff complains of Defendants and alleges as follows:

193.    Plaintiff hereby incorporates by reference paragraphs 1 through 192 herein, as though alleged fully in this Cause of Action.

194.    At this time, all Bard IVC filters are misbranded and adulterated by virtue of them failing to be the substantial equivalent of their predecessor device, making them subject to corrective action, including recall, in the interest of patient safety.

195.    Prior to, on, and after the date of Plaintiff's implantation with the Bard IVC filter, and at all relevant times, Bard designed, distributed, manufactured, sold, and marketed the its IVC filters for use by consumers, such as Plaintiff, in the United States.

196.    Prior to, on, and after the date of Plaintiff's implantation with a Bard IVC filter, and at all relevant times, Defendants knew or reasonably should have known that the IVC filter and its warnings were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner.

197.    Prior to, on, and after the date of Plaintiff's implantation with the IVC filter, and at all relevant times, Bard became aware that the defects of the IVC filters resulted in the IVC filters causing injuries similar to those Plaintiff suffered.

198.    Bard negligently and carelessly failed to recall, retrofit, or warn patients or physicians about the danger of the IVC filters prior to, on, and after the date of Plaintiff's implantation with the IVC filter, and continue to fail to recall the device up until the present time.

199.    Reasonable manufacturers and distributors under the same or similar circumstances would have recalled or retrofitted the Bard IVC filters, and would thereby have avoided and prevented harm to many patients, including Plaintiff.

**COMPLAINT FOR DAMAGES**

200.   In light of the information and Bard's knowledge described above, Bard had a duty to recall and/or retrofit Bard IVC filters.

201.   Bard breached its duty to recall and/or retrofit Bard IVC filters.

202.   As a direct and legal result of the above-described negligent failure to recall or retrofit, Plaintiff suffered the injuries herein described.

203.   Defendants' negligent failure to recall or retrofit the Device and its warnings up until the present time, was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

## FIFTH CAUSE OF ACTION
### [Negligence—Failure to Warn]

For a Fifth Cause of Action, Plaintiff complains of Defendants and alleges as follows:

204.   Plaintiff hereby incorporates by reference paragraphs 1 through 203 herein, as though alleged fully in this Cause of Action.

205.   Prior to, on, and after the date of Plaintiff's implantation with the IVC filter, and at all relevant times, Bard designed, distributed, manufactured, sold, and marketed the Device for use by consumers, such as Plaintiff, in the United States.

206.   Prior to, on, and after the date of Plaintiff's implantation with the IVC filter, and at all relevant times, Bard knew or should have known that the IVC filter was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner.  Such danger included the propensity of the IVC filters to cause injuries similar to those suffered by Plaintiff herein.

207.   Prior to, on, and after the date of Plaintiff's implantation with the IVC filter, Bard knew or reasonably should have known that Bard IVC Filters were defective and dangerous or were likely to be dangerous when used in a reasonably foreseeable manner.

**COMPLAINT FOR DAMAGES**

208.   Such danger included the propensity of Bard IVC Filters to cause injuries and death similar to those suffered by Plaintiff.

209.   At all relevant times, Bard also knew or reasonably should have known that the users of Bard IVC Filters, including Plaintiff, would not realize or discover on their own the dangers presented by Bard IVC Filters.

210.   Reasonable manufacturers and reasonable distributors, under the same or similar circumstances as those of Bard prior to, on, and after the date of Plaintiff's use of a Bard IVC Filter, would have warned of the dangers presented by Bard IVC Filters, or instructed on the safe use of Bard IVC Filters.

211.   Prior to, on, and after the date of Plaintiff's use of the IVC Filter, Bard had a duty to adequately warn of the dangers presented by Bard IVC Filters and/or instruct on the safe use of Bard IVC Filters.

212.   Bard breached these duties by failing to provide adequate warnings to Plaintiff communicating the information and dangers described above and/or providing instruction for safe use of Bard IVC Filters.

213.   Prior to, on, and after the date of Plaintiff's use of the IVC filter, Bard negligently and carelessly failed to adequately warn of the dangers presented by the IVC filter and/or failed to instruct on the safe use of the IVC filter.

214.   Bard's negligent failure to warn prior to, on, and after the date of Plaintiff's use of the IVC filter was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

### SIXTH CAUSE OF ACTION
**[Negligence—Misrepresentation]**

For an Sixth Cause of Action, Plaintiff complains of Defendants and alleges as follows:

215.   Plaintiff hereby incorporates by reference paragraphs 1 through 215 herein, as though alleged fully in this Cause of Action.

216.   Prior to, on, and after the dates during which Plaintiff was implanted with the IVC filter, Bard negligently and carelessly represented to Plaintiff, Plaintiff's treating physicians, and the general public that Bard IVC Filters were safe, fit, and effective for use.

217.   These representations were untrue, and there was no reasonable basis for Bard to believe them to be true.

218.   Bard owed a duty in all of its undertakings, including the dissemination of information concerning its IVC filters, to exercise reasonable care to ensure that it did not in those undertakings create unreasonable risks of personal injury to others.

219.   Bard disseminated to health care professionals and consumers through published labels, labeling, marketing materials, and otherwise information concerning the properties and effects of Bard IVC Filters with the intention that health care professionals and consumers would rely upon that information in their decisions concerning whether to prescribe and use Bard IVC Filters.

220.   Bard, as medical device designers, manufacturers, sellers, promoters and/or distributors, knew or should reasonably have known that health care professionals and consumers, in weighing the potential benefits and potential risks of prescribing or using Bard IVC Filters, would rely upon information disseminated and marketed by Bard to them regarding the Bard IVC Filters.

221.   Bard failed to exercise reasonable care to ensure that the information they disseminated to health care professionals and consumers concerning the properties and effects of Bard IVC Filters was accurate, complete, and not misleading and, as a result, disseminated information to health care professionals and consumers that was negligently and materially inaccurate, misleading, false.

222.   Bard, as designers, manufacturers, sellers, promoters, and/or distributors, also knew or reasonably should have known that patients receiving

Bard IVC Filters as recommended by health care professionals in reliance upon information disseminated by Bard as the manufacturer/distributor of Bard IVC Filters would be placed in peril of developing the serious, life-threatening, and life-long injuries including, but not limited to, tilting, migration, perforation, fracture, lack of efficacy, and increased risk of the development of blood clots, if the information disseminated and relied upon was materially inaccurate, misleading, or otherwise false.

223.    Bard had a duty to promptly correct material misstatements it knew others were relying upon in making healthcare decisions.

224.    Bard failed in each of these duties by misrepresenting to Plaintiff and the medical community the safety and efficacy of Bard IVC Filters and failing to correct known misstatements and misrepresentations.

225.    Prior to, on, and after the dates during which Plaintiff purchased and used the Device, Defendants intended that Plaintiff, Plaintiff's treating physicians, and the general public would rely on said representations, which Plaintiff did reasonably do at said times.

226.    As a direct and proximate result of Bard's negligent misrepresentations, Plaintiff suffered injuries and damages.

227.    Defendants' negligent misrepresentation prior to, on, and after the date when Plaintiff purchased and used the Device was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

### SEVENTH CAUSE OF ACTION
### [Breach of Express Warranty]

For a Seventh Cause of Action, Plaintiff complains of Defendants and alleges as follows:

**COMPLAINT FOR DAMAGES**

228.   Plaintiff hereby incorporates by reference paragraphs 1 through 227 herein, as though alleged fully in this Cause of Action.

229.   Plaintiff, through Plaintiff's medical providers, purchased a Bard IVC filter from Bard.

230.   At all relevant times, Bard was a merchant of goods of the kind including medical devices and vena cava filters (i.e., Bard IVC Filters).

231.   At the time and place of sale, distribution, and supply of Bard IVC Filters to Plaintiff (and to other consumer and the medical community), Bard expressly represented and warranted that Bard IVC Filters were safe; that they were well-tolerated, efficacious, fit for their intended purpose, and of marketable quality; that they did not produce any unwarned-of dangerous side effects; and that they were adequately tested.

232.   At the time of Plaintiff's purchase from Defendants, Bard IVC Filters were not in a merchantable condition, and Bard breached its expressed warranties, in that Bard IVC Filters:

   a. Were designed in such a manner so as to be prone to an unreasonably high incidence of fracture, perforation of vessels and organs, and/or migration;

   b. Were designed in such a manner so as to result in an unreasonably high incidence of injury to the vessels and organs of its purchaser;

   c. Were manufactured in such a manner that the exterior surface of the filter was inadequately, improperly, and inappropriately constituted, causing the device to weaken and fail;

   d. Were unable to be removed at any time during a person's life;

   e. Were not efficacious in the prevention of pulmonary emboli;

   f. Carried a risk of use outweighed any benefit; and

g.  Were not self-centering.

233.   Prior to, on, and after the dates during which Plaintiff was implanted with the IVC filters, and at all relevant times, Bard, and each of them, had knowledge of the purpose for which the IVC filters was to be used, and represented it to be in all respects safe, effective, and proper for such purpose.  Said warranties and representations were made to consumers, such as Plaintiff, and medical professionals, such as Plaintiff's treating physicians.  Plaintiff and Plaintiff's treating physicians relied on said warranties and representations in deciding to use the IVC filter.

234.   Bard breached the above-described express warranties and representations in that the IVC filters did not conform to these express warranties and representations, as the IVC filters were and are not safe or effective and it produces serious side effects including, among other things, the injuries Plaintiff suffered.

235.   Bard's breach of said express warranties and representations prior to, on, and after the date Plaintiff used the IVC Filter was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

## EIGHTH CAUSE OF ACTION
### [Breach of Implied Warranty of Fitness for Particular Purpose]

For an Eighth Cause of Action, Plaintiff complains of Defendants and alleges as follows:

236.   Plaintiff hereby incorporates by reference paragraphs 1 through 235 herein, as though alleged fully in this Cause of Action.

237.   Bard impliedly warranted that Bard IVC Filters were of merchantable quality and safe and fit for the use for which Bard intended them, and Plaintiff in fact used them.

238.   Bard breached its implied warranties by:

a.  Failing to provide adequate instruction that a manufacturer exercising reasonable care would have provided concerning the likelihood that Bard IVC Filters would cause harm;

b.  Manufacturing and/or selling Bard IVC Filters when those filters did not conform to representations made by Bard when they left Bard's control;

c.  Manufacturing and/or selling Bard IVC Filters that were more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner;

d.  Manufacturing and/or selling Bard IVC Filters that carried foreseeable risks associated with the Bard IVC Filter design or formulation which exceeded the benefits associated with that design;

e.  Manufacturing and/or selling Bard IVC Filters when they deviated in a material way from the design specifications, formulas, or performance standards or from otherwise identical units manufactured to the same design specifications, formulas, or performance standards; and

f.  Impliedly representing that its filters would be effective in the prevention of pulmonary emboli.

239.   Prior to, on, and after the dates during which Plaintiff purchased and was implanted with the IVC filter, Bard knew or had reason to know that Plaintiff intended to use the IVC filter for a particular purpose, namely prevention of injury caused by PE.

240.   Prior to, on, and after the dates during which Plaintiff purchased and was implanted with the IVC filter, Plaintiff and Plaintiff's treating physicians justifiably relied on Bard's skill and judgment.

241.   Prior to, on, and after the dates during which Plaintiff purchased and was implanted with the filter, it was in fact not suitable for the relevant particular purpose, namely prevention of injury caused by PE.

242.   Prior to, on, and after the dates during which Plaintiff purchased and was implanted with the filter, Bard was put on notice of the filter's inability to conform to these warranties.

243.   Bard's breach of said implied warranty of fitness for a particular purpose prior to, on, and after the date Plaintiff purchased and was implanted with the filter was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

## NINTH CAUSE OF ACTION
### [Breach of Implied Warranty of Merchantability]

For a Ninth Cause of Action, Plaintiff complains of Defendants and alleges as follows:

244.   Plaintiff hereby incorporates by reference paragraphs 1 through 243 herein, as though alleged fully in this Cause of Action.

245.   Prior to implantation with the IVC filter, Plaintiff purchased the IVC filter from Bard.

246.   Prior to, on, and after the dates during which Plaintiff purchased and was implanted with the filter, Bard was in the business of selling medical devices, such as IVC filters.

**COMPLAINT FOR DAMAGES**

247.   Prior to, on, and after the dates during which Plaintiff purchased and was implanted with the filter, the IVC filter was, among other things: not of the same quality as those other, similar IVC filters generally acceptable in the trade; not fit for the ordinary purpose for which such IVC filters are generally used; and did not conform to the quality established by the usage of the trade.

248.   Prior to, on, and after the dates during which Plaintiff purchased and was implanted with the IVC filter, Defendants, and each of them, were put on notice of the filter's inability to conform to these warranties.

249.   Bard's breach of said implied warranty of merchantability prior to, on, and after the date Plaintiff purchased and was implanted with the IVC filter was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

## TENTH CAUSE OF ACTION

### [Fraud—Misrepresentation]

For a Tenth Cause of Action, Plaintiff complains of Defendants and alleges as follows:

250.   Plaintiff hereby incorporates by reference paragraphs 1 through 250 herein, as though alleged fully in this Cause of Action.

251.   At all times relevant to this cause, and as detailed above, Bard intentionally provided Plaintiff, her physicians and the medical community, as well as the public at large, with false or inaccurate information, and/or omitted material information concerning its IVC filters, including, but not limited to, misrepresentations regarding the following topics:

252.   Filters, including, but not limited to, misrepresentations regarding the following topics:

a.  The safety of the Bard IVC Filters;

b.  The efficacy of the Bard IVC Filters;

c.  The rate of failure of the Bard IVC Filters;

d.  The pre-market testing of the Bard IVC Filters;

e.  The approved uses of the Bard IVC Filters; and

f.  The ability to retrieve the device at any time over a person's life.

253.    The information Bard distributed to the public, the medical community, and Plaintiff was in the form of reports, press releases, advertising campaigns, labeling materials, print advertisements, commercial media containing material representations, and instructions for use, as well as through their officers, directors, agents, and representatives.

254.    These materials contained false and misleading material representations, which included: that Bard IVC Filters were safe and fit when used for their intended purpose or in a reasonably foreseeable manner; that they did not pose dangerous health risks in excess of those associated with the use of other similar IVC filters; that any and all side effects were accurately reflected in the warnings; and that they were adequately tested to withstand normal placement within the human body.

255.    Bard made the foregoing misrepresentations knowing that they were false or without reasonable basis. These materials included instructions for use and a warning document that was included in the package of Bard IVC Filter that was implanted in Plaintiff.

256.    Bard's intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff's health care providers; to gain the confidence of the public and the medical community, including Plaintiff's health care providers; to falsely assure the public and the medical community of the quality of Bard IVC Filters and their fitness for use; and to induce the public and the medical community, including Plaintiff's

healthcare providers to request, recommend, prescribe, implant, purchase, and continue to use Bard IVC Filters, all in reliance on Bard's misrepresentations.

257.    Bard's foregoing representations and omissions by Bard were false.

258.    Bard IVC Filters are not safe, fit, and effective for human use in their intended and reasonably foreseeable manner.

259.    Further, the use of Bard IVC Filters is hazardous to the users' health, and Bard IVC Filters have a serious propensity to cause users to suffer serious injuries, including without limitation the injuries Plaintiff suffered.

260.    Finally, Bard IVC Filters have a statistically significant higher rate of failure and injury than do other comparable IVC filters.

261.    In reliance upon the false and negligent misrepresentations and omissions made by Bard, Plaintiff and Plaintiff's health care providers were induced to, and did use Bard IVC Filters, thereby causing Plaintiff to sustain severe and permanent personal injuries.

262.    Bard knew and had reason to know that Plaintiff, Plaintiff's health care providers, and the general medical community did not have the ability to determine the true facts intentionally and/or negligently concealed and misrepresented by Bard, and would not have prescribed and implanted Bard IVC Filters if the true facts regarding Bard IVC Filters had not been concealed and misrepresented by Bard.

263.    Bard had sole access to material facts concerning the defective nature of the products and their propensities to cause serious and dangerous side effects in the form of dangerous injuries and damages to persons who were implanted with Bard IVC Filters.

264.    At the time Bard failed to disclose and intentionally misrepresented the foregoing facts, and at the time Plaintiff used Bard IVC Filters, Plaintiff and Plaintiff's health care providers were unaware of Bard's misrepresentations and omissions.

265.   Bard acted to serve its own interests and having reasons to know consciously disregarded the substantial risk that its IVC filters could kill or significantly harm patients.

266.   In reliance upon the false and negligent misrepresentations and omissions made by Bard, Plaintiff and her health care providers were induced to, and did use the IVC filter, thereby causing Plaintiff to sustain severe and permanent personal injuries.

267.   Plaintiff, her health care providers and general medical community reasonably relied upon misrepresentations and omissions made by Bard where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the IVC filter.

268.   Bard's fraudulent misrepresentations prior to, on, and after the date Plaintiff purchased and was implanted with the filter was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against defendants as hereinafter set forth.

## ELEVENTH CAUSE OF ACTION
### [Fraud—Concealment]

Plaintiff complains of defendants and for an Eleventh Cause of Action alleges as follows:

269.   Plaintiff hereby incorporates by reference paragraphs 1 through 269 herein, as though alleged fully in this Cause of Action.

270.   In marketing and selling the Device, defendants concealed material facts from Plaintiff and Plaintiff's healthcare providers.

271.   Defendants' concealed material facts include, but are not limited to, the following:

a. Bard IVC Filters were unsafe and not fit when used for their intended purpose or in a reasonably foreseeable manner;

b.  Bard IVC Filters posed dangerous health risks in excess of those associated with the use of other similar IVC filters;

c.  That there were additional side effects related to implantation and use of Bard IVC Filters that were not accurately and completely reflected in the warnings associated with Bard IVC Filters; and

d.  That Bard IVC Filters were not adequately tested to withstand normal placement within the human body.

272.  Plaintiff and Plaintiff's healthcare providers were not aware of these and other facts concealed by Bard.

273.  In concealing these and other facts, Bard intended to deceive Plaintiff and Plaintiff's healthcare providers by concealing said facts.

274.  Plaintiff and Plaintiff's healthcare providers were ignorant of and could not reasonably discover the facts Bard fraudulently concealed and reasonably and justifiably relied on Bard's representations concerning the supposed safety and efficacy of Bard IVC Filters.

275.  Plaintiff and Plaintiff's healthcare providers reasonably and justifiably relied on Bard's concealment and deception.

276.  Bard's concealment prior to, on, and after the date Plaintiff purchased and was implanted with the filter was a substantial factor in causing Plaintiff's injuries and damages, as described herein.

WHEREFORE, Plaintiff demands judgment against defendants as hereinafter set forth.


## TWELFTH CAUSE OF ACTION
### [Violations of Applicable State Law Prohibiting Consumer Fraud and Unfair Deceptive Trade Practices]

277.  Plaintiff hereby incorporates by reference paragraphs 1 through 276 herein, as though alleged fully in this Cause of Action.

**COMPLAINT FOR DAMAGES**

278. Bard had a statutory duty to refrain from unfair or deceptive acts or practices in the sale and promotion of Bard IVC filters.

279. Bard knowingly, deliberately, willfully and/or wantonly engaged in unfair, unconscionable, deceptive, fraudulent, and misleading acts or practices in violation of all states' consumer protection laws identified below.

280. Through its false, untrue, and misleading promotion of Bard IVC Filters, Bard induced Plaintiff to purchase and/or pay for the purchase of Bard IVC Filters.

281. Bard misrepresented the alleged benefits and characteristics of Bard IVC Filters; suppressed, omitted, concealed, and failed to disclose material information concerning known adverse effects of Bard IVC Filters; misrepresented the quality and efficacy of Bard IVC Filters as compared to much lower-cost alternatives; misrepresented and advertised that Bard IVC Filters were of a particular standard, quality, or grade that they were not; misrepresented Bard IVC Filters in such a manner that later, on disclosure of the true facts, there was a likelihood that Plaintiff would have opted for an alternative IVC filter or method of preventing pulmonary emboli.

282. Bard's conduct created a likelihood of, and in fact caused, confusion and misunderstanding.

283. Bard's conduct misled, deceived, and damaged Plaintiff, and Bard's fraudulent, misleading, and deceptive conduct was perpetrated with an intent that Plaintiff rely on said conduct by purchasing and/or paying for purchases of Bard IVC Filters.

284. Moreover, Bard knowingly took advantage of Plaintiff, who was unable to protect Plaintiff's own interests due to ignorance of the harmful adverse effects of Bard IVC Filters.

285.   Bard's conduct was willful, outrageous, immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiff and offends the public conscience.

286.   Plaintiff purchased Bard's IVC Filters primarily for personal, family, or household purposes.

287.   As a result of Bard's violative conduct in each of the Plaintiff's respective states, Plaintiff purchased and/or paid for purchases of Bard IVC Filters that were not made for resale.

288.   Bard Bard engaged in unfair competition or deceptive acts or practices in violation of California's consumer protection laws.

289.   As a direct and proximate result of Bard's violations of these statutes, Plaintiff suffered injuries and damages and seeks all available damages under California law.

## PUNITIVE DAMAGES ALLEGATIONS

290.   Plaintiff hereby incorporates by reference, paragraphs 1 through 289 herein, as though alleged fully in this Cause of Action.

291.   At all times material hereto, Bard knew or should have known that Bard IVC Filters were unreasonably dangerous with respect to the risk of tilt, fracture, migration and/or perforation.

292.   At all times material hereto, Bard attempted to misrepresent and did knowingly misrepresent facts concerning the safety of Bard IVC Filters.

293.   Bard's misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff's physicians, concerning the safety of its Bard IVC Filters.

294.   Bard's conduct, alleged throughout this Complaint, was willful, wanton, and undertaken with a conscious indifference and disregard to the consequences that consumers of their products faced, including Plaintiff.

295.   At all times material hereto, Bard knew and recklessly disregarded the fact that Bard IVC Filters have an unreasonably high rate of tilt, fracture, migration, and/or perforation.

296.   Notwithstanding the foregoing, Bard continued to market Bard IVC Filters aggressively to consumers, including Plaintiff, without disclosing the aforesaid side effects.

297.   Bard knew of its Bard IVC Filters' lack of warnings regarding the risk of fracture, migration, and/or perforation, but intentionally concealed and/or recklessly failed to disclose that risk and continued to market, distribute, and sell its filters without said warnings so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious disregard of the foreseeable harm caused by Bard IVC Filters.

298.   Bard's intentional and/or reckless failure to disclose information deprived Plaintiff's physicians of necessary information to enable them to weigh the true risks of using Bard IVC Filters against its benefits.

299.   Bard's conduct is reprehensible, evidencing an evil hand guided by an evil mind and was undertaken for pecuniary gain in reckless and conscious disregard for the substantial risk of death and physical injury to consumers, including Plaintiff.

300.   Such conduct justifies an award of punitive or exemplary damages in an amount sufficient to punish Bard's conduct and deter like conduct by Bard and other similarly situated persons and entities in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

1.   For general (non-economic) damages according to proof at the time of trial;

2.   For special (economic) damages according to proof at the time of trial;

3.   For punitive damages, sufficient to punish and deter Defendants;

4.    For prejudgment interest as permitted by law;

5.    For attorneys' fees;

6.    For costs of suit incurred herein as permitted by law; and

7.    For such other and further relief as this Court may deem proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

DATED:  March 18, 2022

LOPEZ McHUGH LLP


By:   _/s/ Ramon Rossi Lopez_
Ramon Rossi Lopez
Amorina P. Lopez
Attorneys for Plaintiff

**COMPLAINT FOR DAMAGES**